IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 28 2006

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA,

v.

THOMAS PRESSLEY,

    Defendant.

CRIMINAL CASE NO.

1:95-CR-00189-JEC-2

## ORDER

The Court imposed a 16-year sentence on the defendant at the defendant's last sentencing hearing. As the Government has indicated that it may wish to appeal the Court, this Order memorializes, more formally, the Court's basis for imposing a sentence that constitutes a downward variance from the calculated Sentencing Guidelines' range.

## I.  BACKGROUND

This last sentencing represented the fifth proceeding that the Court has conducted concerning the defendant's sentence and the Court's third imposition of a sentence on the defendant in this case, whose proceedings have now spanned a decade. The defendant was indicted, along with four co-defendants, on various drug trafficking counts, as well as a Continuing Criminal Enterprise ("CCE") count. Defendant's co-defendants all entered into favorable plea agreements with the Government and agreed to cooperate; each of these

AO 72A
(Rev.8/82)

defendants, as discussed *infra*, received substantial reductions of their sentences, pursuant to U.S.S.G. § 5K1.1.  Defendant Pressley--very unwisely, given the number of witnesses testifying against him--chose not to work out a plea agreement with the Government and, instead, he was tried before a jury. The jury convicted him on all counts.  This Court entered a judgment of acquittal on the CCE count; the Government did not appeal this acquittal.

The Court conducted extensive proceedings in connection with the first sentencing hearing.  Ultimately, the Court calculated the defendant's Guideline range as a 40, Criminal History Category I, which called for a 292-356 month range.  The Court imposed a sentence of 292 months (24 years and 4 months) [244].  The defendant appealed, after which the Government cross-appealed the sentence.

The basis of the Government's cross-appeal of the sentence was this Court's decision to subtract 2 levels from the originally calculated offense level of 42.  The Court had determined that imposing 4 levels for an assault (2 levels for the restraint that made an assault possible and 2 levels for the use of a dangerous weapon to effectuate the assault) that the defendant committed essentially represented double-counting; the Court indicated that it was reducing the defendant's offense level score by 2 levels, or alternatively entering a downward departure on this basis.

The Eleventh Circuit reversed this Court's decision to subtract 2 points from the defendant's offense level and remanded for a new

2

sentencing.   The Court conducted a second sentencing hearing and added the originally-subtracted 2 points back in.   This yielded an Offense Level 42/Criminal History Category I, for a 360 month-life range.   The defendant requested that the Court downwardly depart as a result of the extraordinary conditions of confinement that the defendant had undergone.   Specifically, the defendant had been in a pretrial detention center with lengthy lock-down hours for several years, as a result of the protracted nature of his proceedings.

This Court indicated that it would depart to a limited extent on this ground if the Court had the power, but the undersigned indicated its belief that it lacked the power to depart on this ground.   As a result, the Court imposed a 360 month sentence (30 years) [277].   The defendant appealed and this time the Eleventh Circuit held that this Court had erred in refusing to consider a downward departure; that is, the Court had the power to depart on the grounds articulated at the second sentencing [289].   Accordingly, the Eleventh Circuit remanded the case for a third sentencing hearing.

By the time a third sentencing hearing was scheduled, the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), had been issued.   Defendant contended, and the Government did not disagree, that this Court was subject to that opinion's dictates when the Court resentenced the defendant.   In other words, the Guidelines were now advisory and the Court could vary from those Guidelines to the extent that it deemed such a variance necessary to

3

the imposition of a "reasonable" sentence under the statutory
guidelines set out in 18 U.S.C. § 3553.  The Court did depart from
the Guidelines, as a result of the ground approved by the Eleventh
Circuit during the second appeal; the Court also varied from the
Guidelines' range.   The Court imposed a 16-year sentence on the
defendant [304].  This Order is intended to set out a summary of the
Court's reasons for doing so.

II.   **PRIOR SENTENCING HEARINGS**

    A.   **Calculation of Defendant's Offense Level at First
     Sentencing**

        1.   **Drug Quantity**

The single-most important factor causing defendant's offense
level to soar so high was the quantity of drugs for which he was held
accountable.  Calculating this quantity of drugs was a particularly
challenging and imprecise exercise as the defendant was charged in a
"dry" or "historical" conspiracy.  That is, the Government had made
no busts in the case and, accordingly, had never seized any drugs.
Instead, defendant's co-defendants, who had pled guilty pursuant to
a cooperation agreement, all testified and related information
concerning different drug deals involving the defendant that they
were aware of or involved in.   From this testimony, the Court
attempted to determine the appropriate quantity of drugs with which
to hold the defendant accountable.  These Government witnesses were
unsophisticated and uneducated people who had kept no records and

4

hence were testifying from memory about incidents that had occurred years before.  They were sometimes vague about dates, and the quantities estimated by them did not always hang together, upon a more careful examination of their testimony.  Moreover, these defendants arguably had an incentive to inflate the amount of drugs involved because they knew that they might be receiving a hefty § 5K1.1 reduction anyway, and the more that they helped the Government in its prosecution of Pressley, the more help they could expect from the Government.

The Government contended that the defendant should be held responsible for 150 kilograms or more of cocaine, which calculation, if accepted, would have yielded an Offense Level of 38.[1]  The defendant objected to this calculation, but, in these objections, did not identify the level he deemed to be appropriate; at the sentencing hearing, however, the defendant, through counsel, indicated that the drug quantity amount should be 34, not 38.

The Court labored over this calculation and its own uncertainty as to the quantity determination that it was called on to make, given the imprecise and potentially untrustworthy testimony offered by the co-defendants.  (*See* Transcript of December 4, 1998 [hereinafter "December, 1998 Proceeding"] at 20-25; Transcript of May 24, 1999 [hereinafter "First Sentencing Hearing"] at 5-31.)  Ultimately, the

---

[1]  A Level 38 is as high as the Drug Quantity Table goes.  Hence, the Government was asking that the defendant be given the greatest enhancement possible for drug quantity.

AO 72A
(Rev.8/82)

Court held the defendant accountable for at least 50 kilograms but less than 150 kilograms of cocaine, or an Offense Level of **36**.

### 2. Role Adjustment

The Government contended that the Court should enhance the defendant's offense level by another 4 levels, because the defendant was a leader or organizer of a joint venture involving five or more persons. The Court disagreed, for the reasons stated at the hearing. *See* First Sentencing Hearing at 31-41. Specifically, the defendant never seemed to organize or lead anyone on a systematic basis. He was a sole entrepreneur who handled most of his business by the dint of his own wits and efforts. The Court did note that, although, for the most part, the defendant appeared to operate as a solo practitioner, with no subordinates or bosses, on one occasion he had "supervised" others in acts that furthered his drug trafficking venture. Accordingly, the Court enhanced the defendant's offense level by 2 more levels, pursuant to U.S.S.G. § 3B1.1(c), moving the defendant to a Level **38**.

### 3. Possession of a Dangerous Weapons

Except for the assault of Stanley Moore, described below, there had been no testimony that the defendant had ever been seen with a firearm or dangerous weapon, much less used such a firearm, during the course of his drug trafficking ventures. On one occasion, however, the defendant was responsible for assaulting someone who he believed had stolen his drugs.

6

AO 72A
(Rev.8/82)

Specifically, when not dealing drugs, the defendant hung out at a car wash establishment, along with several other unemployed, sorry men, who did not earn their livings in the old-fashioned 9-5 way. Some bought drugs; some sold drugs; none appeared to ever do anything remotely honest or honorable to earn their money.  The defendant had been storing some cocaine in a wrecked automobile on these premises when he discovered, to his great dismay, that someone had stolen his drugs.  This was a bad development for the defendant because he knew that his suppliers in Miami, from whom he had purchased the drugs on consignment, wanted their money.  Indeed, agents of these drug dealers from Miami traveled up to Atlanta and beat up the defendant, in an effort to get him to pay up or provide the drugs.

Greatly chastened by this collection effort, the defendant was also greatly motivated to find the missing drugs.  Believing that a Stanley Moore, a fellow who hung out at the car wash, had stolen the drugs, the defendant, waving a gun at Moore, had three other guys from the car wash take a car jack to Mr. Moore and beat him up, in order to see if Mr. Moore could be persuaded to return the drugs.[2] (The defendant also had his girlfriend bring a stun gun to the interrogation site, but it did not work and was not used).  Mr. Moore testified that he had not taken the drugs.  At any rate, he never

---

[2]   According to the testimony, the defendant told these three other men not to beat Moore around the head. These men apparently disregarded this directive as the police officers, when they arrive on the scene, found Moore bleeding from his head. (December 4, 1998 Hearing).

admitted to taking the drugs, and after the defendant and his two cohorts left, Mr. Moore broke free; he was hospitalized for a few days as a result of his injuries.

Given the above incident, the Court enhanced the defendant's offense level by **2 levels, to a Level 40**, as a result of the defendant's possession of a dangerous weapon, per U.S.S.G. § 2D1.1(B)(1).

### 4.   **Restraint of A Victim**

The PSR had recommended a 2-level enhancement for "restraint of the victim," pursuant to § 3A1.3. This enhancement was literally applicable: that is, the defendant's three buddies had ultimately tied up and/or applied duct tape to the victim and the chair in which he was seated, to keep him from running away, as a fleeing victim is more difficult to assault than is one who is standing still. Nevertheless, the Court ultimately decided not to apply the "restraint of a victim" enhancement to the Guideline score. The Court indicated that it did so either as a matter of Guidelines' calculation or, alternatively, as a downward departure.

The Court reasoned that while the restraint and possession of a weapon enhancement addressed arguably different harms--and hence did not represent double-counting as a facial matter--in this particular case, the two enhancements really addressed the same conduct: the defendant's assault of Moore in order to persuade the latter to tell where the stolen drugs were. The restraint and the weapon were both

8

necessary to effectuate the assault.   Accordingly, whether as a matter of Guidelines' application or as a departure, because the particular facts of this case did not mesh with the heartland case in which a restraint enhancement would apply, the Court declined to apply the additional 2-level enhancement for restraint.   As noted, the Court had applied the 2-level enhancement for possession of a dangerous weapon.   The final offense level calculated at this first sentencing was 40, Criminal History Category I, with a 292-365 month range.   The Court imposed a 292 month (24 year, 4 month) sentence.

Also as noted, however, the Eleventh Circuit later reversed this Court's determination not to apply a two-level enhancement for restraint of a victim, meaning that the total offense level should have been calculated as a 42/Category I, with a 360 month-life range.

**B.   Third Sentencing**

On remand, the Court sentenced the defendant to 30 years (360 months) during the second sentencing hearing, based on the above-cited 42/Category I Offense Level and Criminal History score, which called for a sentence of 360 months-life.   On appeal by the defendant, however, the Eleventh Circuit again remanded the case because that Court concluded that this Court could have departed during this second sentence, based on the extraordinarily punitive conditions of the defendant's incarceration during the pendency of his sentencing proceedings.   As noted, this Court had articulated a belief that such a departure would have been invalid.

9

At the third, and hopefully last, sentencing hearing, this Court acknowledged the above guidelines calculation and its ability and willingness to depart on the basis of the defendant's extraordinarily punitive pretrial conditions.  This third sentencing occurred after *Booker*, however.  Therefore, because the Court's mandate at this third sentencing was be "advised" by the Guidelines, but ultimately to impose a "reasonable" sentence, pursuant to the very general sentencing goals set out at 18 U.S.C. § 3553, the Court was not wed to this Guidelines' calculation.  As a result of this new-found flexibility, this Court calculated the Guidelines as an Offense Level 42/I (360 months -life) **less** whatever downward departure this Court deemed reasonable as a result of the Eleventh Circuit's approval of a departure based on the extraordinary conditions of the defendant's pre-designation confinement.  The Court further "varied" from this Guidelines sentence and imposed a 16-year (192 months) sentence on the defendant.  The following represents the Court's thinking as to the imposition of this particular sentence.

III. **Reasoning Behind "Variance" Imposed at Third Sentencing Hearing**

    A. **Application of 6 Levels of Enhancements At Earlier Sentencing Hearings Represented Close Determinations by the Court**

        1. **Pertinence of the Nature and Circumstances of the Offense in a Post-*Booker* Analysis of Reasonableness**

In a post-*Booker* world, the sentencing court is supposed to accurately calculate the Guidelines score.  Thereafter, the court

10

must impose a "reasonable" sentence, which sentence may be higher, lower, or the same as the sentence called for by the Guidelines. Part of this Court's thinking, in imposing a sentence lower than a sentence that would be called for by a mandatory Guidelines system, was an awareness that imposition of 6 levels of Guidelines' enhancements at the first two sentencings represented close calls for the Court that were greatly disputed by the defendant. A mechanical application of these enhancements in the defendant's case thereby resulted in a sentence for the defendant that this Court believed to have overstated the seriousness of his conduct, his culpability, and the danger to the community that he represented. The ability to impose a "reasonable" sentence enabled this Court to take a more flexible look at these particular enhancements to determine whether their application resulted in a sentence that was contrary to the sentencing goals set out by statute.

It has become almost a mantra that a sentencing court cannot utilize its *Booker* flexibility to impose a sentence that represents a disagreement with policy decisions made by Congress in enacting the Sentencing Guidelines. Thus, a sentencing court may not impose a below-Guidelines sentence merely because, for example, it disagrees with Congress' decision to quantify the possession of crack cocaine versus powder cocaine at a ratio of 100 to 1 or because it believes that the career offender provision of the Guidelines is unduly harsh. (*See, e.g., United States v. Williams,* ___F.3d___, 2006 WL 2039993

11

(11th Cir. July 21, 2006).)  In such a case, however, the sentencing court may justify a below-Guidelines sentence by relying on individual factors present in the particular defendant or his case, which factors would be cognizable under 18 U.S.C. §3553(a).

If, for example, the Guidelines call for a 15-year sentence for a crack cocaine defendant, the sentencing court cannot indicate that it has imposed a lesser sentence because it disagrees with the policy decisions that led to that level of punishment for possession of this particular substance; the court can, however, impose a lesser sentence if it can persuasively articulate factors, associated with the individual defendant, that would count as a § 3553(a) factor. For example, a court could presumably justify a lower sentence, not because it disagreed with Congress' policy decisions, but on the ground that the defendant was exceptionally young (or old), or that the defendant had a very tough family background (or a very supportive family), or that the defendant had dependents whom he had to support, because these factors represent "the history and characteristics of the defendant."  § 3553)(a)(1).

The Court does not interpret the caselaw holding the above to mean, however, that the only basis for a variance under *Booker* is one of the very subjective grounds pertinent to the "offender," set out above.  Rather, this Court assumes that a sentencing court can, and should, on occasion, reexamine its own application of the Guidelines to assure itself that a literal application of debatable Guidelines'

12

enhancements will give rise to a reasonable sentence that takes into account the "nature and circumstances of the offense." *Id.* That is, the circumstances of the "offense," are just as much  fair game for a *Booker* reasonableness appraisal as are the circumstances of the "offender."

Such an exercise does not mean that the sentencing court is ignoring the Guidelines or even disagreeing with them.  To the contrary, such an approach builds on the philosophy toward departures expressed in the Introduction to the originally-enacted Guidelines, in which the Sentencing Commission noted:

> The Commission intends the sentencing courts to treat each guidelines as carving out a "heartland," a set of typical cases embodying the conduct that each guidelines describes. When a court finds **an atypical case, one to which a particular guidelines linguistically applies but where conduct significantly differs from the norm**, the Court may consider whether a departure is warranted.

U.S.S.G. § 1A1.1, Part One (Introduction) at 4(b)(1987)(emphasis added).

Indeed, a case could be made that a variance that focuses more on the circumstances of the offense, than on the characteristics of the offender, is a variance that is less likely to reflect the widely divergent and subjective views of sentencing judges and that, accordingly, is more likely to result in similar sentences for people who have committed similar offenses.  That is, as suggested in the hypotheticals above, some judges believe that a defendant should receive a lesser sentence because he is young and less culpable;

13

other judges (and the former Parole Commission) believe that a young offender can pose significantly greater danger to the community, particularly in violent or street crimes, and that he should therefore have his sentence bumped higher. Some judges may believe that an older offender should receive a break because of his age and because a prison sentence will likely cause great pain and dislocation to those family members who hold him dear; other judges may believe that an older offender should have known better and that such a person should be cut no slack. Some judges may believe that an offender who comes from a very dysfunctional family background should receive a lower sentence because this offender never had an opportunity to learn right from wrong; other judges may believe that, while such an offender may be less culpable, he poses more future danger to the community than does an offender from a stable home background, who should receive a lesser sentence because of the lower risk that he poses. And some judges, at some point in their careers, may hold all of the above views, simultaneously, depending on which offender is before them at a particular time.

Thus, while an appraisal of the attributes of the offender can be entirely appropriate under a § 3553 analysis, a focus on the circumstances of the offense is no less appropriate, just because an examination of the circumstances of the offense draws one back into the Guidelines, disagreement about which is *verboten* under the post-*Booker* caselaw. As noted, a focus on the offense arguably leads to

14

a more disciplined, consistent, and honest approach to the ultimate sentencing decision.  In short, this Court deems conduct that could colorably constitute a valid ground for departure--even if that conduct could not quite clear the tough, pre-*Booker* hurdle for a departure--as appropriate for consideration as a ground for a variance. With these thoughts in mind, the Court notes its concerns about three particular Guidelines enhancements imposed on the defendant in this case.

## 2. Role Adjustment

At the original sentencing, the Government had urged this Court to impose a 4-level enhancement, arguing that the defendant was a leader or organizer of criminal activity involving five or more participants, pursuant to USSG § 3B1.1(a).  As set out above, the Court instead imposed a 2-level enhancement on the defendant, pursuant to § 3B1.1(c) (organizer, leader, manager, or supervisor in any criminal activity).  The Court's protracted ruminations and concern about imposing any aggravating role adjustment indicate the closeness of the question. (*See, e.g.,* Transcript of August 22, 1997 Morning Hearing [hereinafter "August 1997 Morning Hearing] at 6 *et seq.*; Transcript of  December 1998 Hearing at 1-10; First Sentencing Hearing at 31-41.)

As the Court noted during the sentencing hearings, the defendant hung out at a car wash establishment with quite a few other ne'er-do-wells who engaged in criminal conduct to support themselves.  The

15

defendant dealt in a goodly amount of drugs during the time period in question and, as drug dealing is, by its nature, not a solitary pursuit, he interacted with other people when he sold to or bought drugs from them.    As the Court repeatedly noted, however, the defendant was hardly a kingpin or even an organizer or supervisor of others.    Rather, as the Court noted, he was a "one man band": "an aggressive hustler," who would perform any function of a drug operation in order to make money.  (Dec. 4, 1998 at 11, *et seq.*).  Thus, sometimes the defendant sold drugs; sometimes he would buy drugs; other times he would front drugs; once, he was even a courier for drugs.  (*Id.*)   In none of these relationships were the others involved with the defendant his subordinates.    As the testimony reflected, the defendant could not have built a very successful organization, because he was a cheapskate who welched on paying money that he owed to others; such behavior does not help in recruiting subordinates.   (*Id.*)    That the defendant was not a leader in the organization was illustrated when the Miami group beat him up because he had lost their drugs.    That the defendant had no network of bodyguards or allies to help him out when this occurred vividly illustrates the solitariness of his own pursuits.[3]  (August 22, 1997 Morning Hearing at 10).

---

[3]   Ernest Hill, the person with whom the defendant sometimes divided up drug shipments, saved the defendant by ultimately paying off the latter's drug debt, which caused the Miami group to then leave the defendant alone.

16

As the Court noted during a sentencing hearing, out of seven volumes of trial transcripts, the Court was able to identify only two possible scenarios in which the credible evidence indicated that the defendant was arguably a supervisor or leader. (First Sentencing Hearing at 32.) First, on one occasion, the defendant got Stanley Moore to pick up a cracker box containing money from a mailbox. True to form, the defendant never paid Moore for this errand. On a second occasion, the defendant got three of his cohorts at the car wash to beat up Moore, whom the defendant suspected of stealing the drugs, which drug theft caused the Miami group to beat the defendant up.

With regard to defendant's use of Moore to retrieve the cracker box, the Court agreed with defense counsel that Moore was functioning more like a day laborer that the defendant had utilized for a discrete task than a member of an organized activity whose labors the defendant had the power to control and direct. With regard to defendant's use of his three cohorts to beat up Moore, the Court ultimately awarded a 2-level aggravating role enhancement for this conduct. Yet, while, as a literal matter, the defendant acted as a supervisor of these three individuals, on this one occasion, the Court deems this conduct to represent the kind of case in which "a particular guidelines <u>linguistically</u> applies but where conduct significantly differs from the norm." (*Supra* at 13.) That is, in the typical drug case in which a defendant receives an aggravating role enhancement, the defendant has assumed that role on more than

17

just a few isolated occasions.  Instead, one can fairly characterize such a defendant as a supervisor or leader in the criminal endeavor. Here, as a result of isolated conduct that does not typify the defendant's normal functioning as a drug dealer, the defendant received a 2-level enhancement, which, when applied to a base offense level of 36 (188-235 months), increased the defendant's sentencing exposure by forty-seven months (OL 38=235-293 months).  A four-year increase in one's sentence as a result of two isolated instances in which the defendant directed others to commit criminal activity does not seem reasonable to the Court, nor does it seem to further the purposes of sentencing, given all the circumstances of the offense and of the offender, discussed *infra*.  Even if a departure on such a ground would not be sustained in pre-Booker days, a variance as a result of this "circumstance" of the offense seems reasonable and appropriate to this Court.[4]

---

[4] Arguably, the Court, at this original sentencing hearing, should not have enhanced the defendant at all for a leadership role, inasmuch as the defendant functioned as a supervisor only on two isolated occasions. One factor pushing the Court toward imposition of this role enhancement was the fact that this Court had imposed a role enhancement on co-defendant Ernest Hill, who had cooperated with the Government, and whose culpability was on a par with the defendant's.

This Court normally sentences all co-defendants at the same time, in order to avoid any potential inconsistency that could occur when a defendant sentenced at an earlier proceeding receives an enhancement that a subsequent defendant persuades the Court not to impose.  Further, if the defendants are pointing fingers at each other, it makes sense to sort the dispute out at the same proceeding.

The present case is the only case that the Court can recall in which it bifurcated the sentencing hearings of roughly equal

AO 72A
(Rev.8/82)

### 3.   __Restraint of Victim Adjustment__

As set out above, the Court imposed a 2-level enhancement on the defendant, pursuant to USSG § 3A1., after being directed to do so by the Eleventh Circuit, which reversed this Court's initial decision not to impose this enhancement.  The Court's reasoning in discounting this enhancement, for purposes of a variance analysis, is similar to its thinking with regard to the role enhancement.

Specifically, at the first sentencing hearing, the Court noted its reasoning for concluding that a downward departure of 2 levels, to undo imposition of this enhancement was appropriate.  (*See* First Sentencing Hearing at 21-26.)  To repeat, there was no testimony to establish that the defendant had been seen with a dangerous weapon during the five-year span of his drug activities, except for the incident with Stanley Moore, in which the defendant was seen waving a pistol toward Moore and in which the defendant's cohorts had a car jack.  Had the defendant been sighted just once in a five-year period with a dangerous weapon, the Court would not have imposed an

---

defendants, at odds with each other.  It is an object lesson that demonstrates why this is not a good practice. The Court did so because Mr. Pressley's other proceedings were so protracted that the Court was disinclined to make the co-defendants wait any longer for a sentencing date that would permit them to be designated to a permanent prison facility.  Having earlier imposed a role enhancement on Hill, the Court was perhaps too focused on consistency when it likewise imposed this enhancement on defendant.  As noted *infra,* while Hill received an enhancement, he also received such a generous reduction pursuant to § 5K1.1, that the earlier enhancement was effectively eviscerated.

AO 72A
(Rev.8/82)

enhancement for possession of a dangerous weapon.  As one of these weapons--the carjack--was used to hurt Moore, however, the Court did impose a 2-level enhancement for possession of a dangerous weapon.

As the Court was thereby essentially imposing this enhancement only because the weapon, a carjack, was actually used to hit someone, the Court was effectively imposing a 2-level enhancement for an assault.  The next question was whether the "restraint of victim" enhancement also should have applied, as the defendant's cohorts had secured the victim, Stanley Moore, to his chair, with duct tape.  Literally, the application applied, as § 1B1.1 , Commentary 1(K), provides that "physically restrained" means "the forcible restraint of the victim such as by being tied, bound, or locked up. Yet, as the Court noted, the physical restraint of the victim to keep him from getting away was a part and parcel of the assault, for which the Court had already effectively assessed a 2-level enhancement.

Of course, just because an argument could be made that imposition of the additional restraint enhancement constituted double counting for the assault does not necessarily mean that a downward departure should occur.  After all, assault with a weapon is a serious matter and a defendant who causes such an assault to be committed should be removed from society for an appropriate period of time.  Thus, were a defendant who had assaulted another during the course of a crime facing a Level 16 offense level, for example, before any other enhancement for a weapon and for restraint, the

Court would impose all four levels and likely depart up as well to ensure a commensurate punishment. Here, however, these enhancements were building on an Offense Level of 36, and increasing that level by 2 levels for the possession of a dangerous weapon meant that the defendant had already received a four-year increase in his sentence (from a roughly 15-year sentence to a 19-year sentence). Increasing the offense level by another 2 levels for the restraint enhancement would have meant that the defendant would have received an additional five-year sentence, as a result (from a Level 38 (235-293 months) to a Level 40 (292-365 months), or an additional nine years for the incident, in addition to the 15-year sentence for the drug crime.

Looking at the particular characteristics and circumstances of this offense and this offender, the Court concludes that such an increase is disproportionately high.[5]   While this ground did not

---

[5] That it is disproportionate can be illustrated by a comparison of the sentencing calculation that would have occurred had the defendant been charged and convicted of this assault, as opposed to receiving indirect enhancements for the assault. Specifically, had the defendant been specifically convicted of assaulting Moore, along with his drug conviction, he would have been subject to § 2A2.2 Aggravated Assault. His base offense level would have been a level 14, enhanced by 4 levels (because a dangerous weapon was used) and either 3 or 5 more levels (because "bodily injury" or "serious bodily injury," respectively, occurred to Moore). The final offense level for the assault would have been either a 21 or 23, depending on the degree of injury assessed by the court.

When a defendant is convicted of two separate and different types of crimes, the grouping rules direct how much of an increase in sentence the second and less serious crime should create. § 3D1.4(c) indicates that one compares the two offense levels for the two offenses and, if the less serious offense, is 9 or more levels less serious than the offense with the higher offense level, the second

21

previously satisfy muster as a downward departure, the Court concludes that it provides a reasonable basis to vary by 2 levels from the Guidelines calculation.

### 4.   Drug Quantity Calculation

As noted previously, the Guidelines factor driving this sentence was the calculation of drug quantity attributable to the defendant in this historical or dry conspiracy. Accordingly, the factual finding as to that quantity was a crucial factor in determining what the defendant's Guidelines' range would be.  In *Booker*, the Supreme Court determined that the Guidelines were no longer binding on sentencing judges because any finding that would <u>necessitate</u> an increase in a defendant's sentence was a finding that had to be made by a jury, utilizing a reasonable doubt standard.

As a practical matter, prior to *Booker*, this Court had rarely heard much criticism concerning the identity of the finder of fact;

---

offense level is not counted in calculating the offense level, although it may provide a reason for an upward departure.

Here a Level 21 or Level 23, even enhanced by 2 level increase for restraint of a victim (to a Level 23 or 25) would have been 9 or more levels less severe than any offense level that the defendant would have received for his drug conviction, and hence would not have counted at all in the calculation of the Guidelines.

Accordingly, if the defendant would have received no increase in his sentence, had he actually been convicted of an assault, the Court deems it adequate that he received a 4-year increase as a result of the literal application of the provisions of § 2D1.(b)(1) and deems it unreasonable to enhance him by 8-9 years, which would occur by applying for the additional restraint of victim enhancement.

instead, most criticism was directed at the harshness and inflexibility of the resulting sentencing ranges, no matter who the finder might be. The identity of the finder of fact was likely a secondary concern to most practitioners, in part, because factual findings are often a fairly obvious matter in making Guidelines' calculations. That is, reasonable minds could rarely differ as to a factual conclusion concerning the amount of money that a fraud defendant obtained from his victim, as to whether a robber used a gun, or as to the quantity of drugs that a DEA agent had uncovered during a drug bust. That being so, the majority *Booker* opinion seemed, for the most part, to be a solution in search of the wrong problem.

Nevertheless, a few sentencing situations do give resonance to the Supreme Court's sensitivity about the validity of the factual findings underpinning the Guidelines' calculation. Historical or dry conspiracies are certainly one of those scenarios. Again, a dry or historical conspiracy is one in which the only evidence of the illegal drug activity is the testimony of others who recount, historically, such activities. In such cases, the Government will have seized no drugs and will often have no evidence other than the testimony of its witnesses concerning the defendant's past drug activities.

That this case was a historical or dry conspiracy case rendered problematic a precise calculation of the amount of drugs for which

23

the defendant should be held accountable. Indeed, at the previous proceedings, the Court expressed its difficulty calculating, with certainty, the amount of drugs attributable to the defendant. (*See* December 1998 Hearing at 20-34; First Sentencing at 5-31.) As with most historical cases, the witnesses testified about a protracted period of time and were vague on some dates. The particular witnesses here were not sophisticated or educated people. None of them kept any ledgers or records; instead, they relied on their memory of various drug deals and quantities. As with most historical cases, it was sometimes challenging to keep straight a particular quantity of drugs, such that if one witness talked about the defendant buying x amount of drugs, one did not double-count that drug when a different witness may have discussed seeing defendant sell drugs that could have been part of the purchase for which he had already been held accountable.

In addition to the absence of precision that typically attends such testimony and the possibility that memories of numbers are not always accurate, the defendant also argued that these defendant-witnesses had an incentive to exaggerate the quantities of drugs with which he was involved in order to please the Government and to obtain a more favorable recommendation from the Government when it came time for the § 5K1.1 motion.

Certainly, the Court was mindful of those matters and, having read the record multiple times, the Court recounted some of those

24

instances in its own remarks at sentencing proceedings. (*See* citations to record, *supra.*)   Specifically, the Court noted that sometimes Ernest Hill's numbers related to deals that he had alone and sometimes they related to deals in which Pressley was involved. First Sentencing at 27.   Sometimes, Hill's math did not hold together. (*Id.* at 30.)  (Hill indicates that he made $4,000 per kilo on a 150 kilo deal, but later says that he made a million dollars on that sale).

Indeed, the co-defendant witnesses, themselves, initially challenged the quantities that had been assessed against them in their own presentence reports.   In his objections, Hill had argued that Candiss and Harris had exaggerated his quantity.   (First Sentencing at 29-30.) Co-defendant Drew had made the same argument about Harris, noting that Harris had greatly increased his quantity estimate from the time of his debriefing (40 kilos) until his grand jury testimony (300 kilos).[6]  (*Id.* at 30.)

If this record reveals anything, it reveals that this Court took

---

[6]  As counsel for Drew stated:

> "Historical estimates of cocaine sales have to
> be troublesome to all concerned.  The defendants
> are not accountants and are rarely steeped in
> the kind of detail that law enforcement requires
> them to produce.  Defendants quickly learn what
> is expected of them and, as in the case of
> Harris, estimates rise accordingly."

(Defendant Drew's Motion for Downward Departure and Sentencing Memorandum [185] at 6.)

AO 72A
(Rev.8/82)

very seriously its duty to do its best to accurately calculate the drug quantity and all other Guidelines factors.   Indeed, the Court does not believe that a jury with a reasonable doubt standard would have been any more careful in its findings than was this Court.   The Court read and reread the record.   The Court did not apply an enhancement just because the Government requested it or the PSR suggested that it should be applied.   To the contrary, in virtually every instance, the Court gave the benefit of the doubt to the defendant.   The one exception was the calculation of the quantity of drugs, however.

The Court indicated its desire to be conservative in its calculation of this quantity, and it did assess a Level 36, instead of the 38 recommended in the PSR.   While the Court did attempt to be conservative in its calculations, the difficulties in calculating precisely the quantity should be noted. Moreover, it should also be noted that the defendant, through his counsel, had argued that the base offense level arrived at from figuring the quantity of drugs should have been a level 34.   In short, in any examination of the appropriateness of the Court's ultimate decision to vary from the Guidelines' sentence, the fluidity of the quantity calculation cannot be ignored.

### 5.   Ramifications to Guidelines' Calculation of the Six Contested Levels

The Court effectively varied to the extent of removing the 2-

AO 72A
(Rev.8/82)

level enhancement for role and the 2-level enhancement for restraint. Applying these reductions, and assuming a Base Offense Level of 36, plus 2 levels for the possession of a dangerous weapon, the defendant would have been at a level 38/I, with a 235-293 month sentencing range. As the Eleventh Circuit had authorized a departure for the lengthy and onerous conditions of confinement to which the defendant was subject in the multi-year sentencing process,, this Court had indicated that it would depart down approximately 30 months for those condition. Subtracting 30 months from a 235 month sentence, which was the low end of a level 38, yields 205 months. The Court's ultimate sentence of 192 months (16 years) was only 13 months less than this 205 month sentence, arrived at by varying 4 levels from the Guidelines calculation.

**B.    A Variance Was Justified to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

As noted, this Court has made an effort to hew closely to a Guidelines' framework in its efforts to determine a reasonable sentence and a reasonable variance in this case, based on the nature and circumstances of the offense. In addition, a factor explicitly mentioned in § 3553 also exists in this case and arguably warrants a variance: to wit, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

In this case, three comparators exist whose drug dealing

27

activities were comparable to the defendant's: defendants Hill, Simpson, and Drew. Because these defendants rendered substantial assistance, however, they received much lower sentences than the defendant. Specifically, defendant Hill received a 12-year sentence; defendant Simpson received a seven-year sentence to run concurrently with another sentence previously imposed for a firearms violation, with the combined sentence for both offenses totaling 9 ½ years; defendant Drew received approximately a 6-year sentence (70 months).

While the drug dealing activities of these defendants was comparable, particularly as between the defendant and defendants Hill and Simpson, defendants Hill and Simpson had substantially worse criminal records than the defendant, who was a Criminal History Category I.[7]   Hill was a Category VI, having several felony convictions, including a conviction for attempted carjacking in 1981. Simpson was a Category IV, having a prior drug trafficking conviction and the conviction for possession of stolen guns, which 5-year sentence he was serving when the Court sentenced him on this case.

Without a § 5K reduction, and assuming that the Court would have assessed his quantity at a Level 36 and given him a 2-level role enhancement, just as it originally calculated the defendant's Guidelines, and with a 3-level reduction for acceptance of

---

[7]   Defendant had a misdemeanor conviction for carrying a concealed weapon, for which he paid a $330 fine, and a conviction for giving a police officer a false name, for which he paid a $120 fine. He had one criminal history point as a result of these infractions.

28

responsibility, defendant Hill was looking at a Level 38/VI, or 360 months to life.[8] With a 30-year sentence representing the bottom end of this range, Hill's 12-year sentence represented a 60% reduction. Defendant Simpson's offense level was 31/IV, yielding a 151-188 months range, meaning that he was subject to a 12 ½ year sentence had he not received a 5 ½ year reduction for his cooperation.  His seven-year sentence thus represented a 44% reduction in his sentence. As noted, this Court imposed a 16-year sentence on defendant Pressley at the last sentencing; absent a variance from the Guidelines, however, the Court would have had to impose a 27 ½ year sentence (360 months less the 30 month downward departure for conditions of confinement).

The question is whether this disparity in the unvaried sentence of the defendant (27 ½ years) versus the sentences given to his cooperating co-defendants--12 years, 7 years, 6 years--is an unwarranted disparity.  Normally, this Court would answer that question in the negative.  Congress has recognized substantial assistance as a ground for reducing a defendant's sentence and therefore a disparity on that basis is a warranted disparity.

Moreover, in a post-*Booker* world, in which a judge can cite disparities between defendants as a basis for a variance, an appellate court will presumably view with great skepticism a district court's

---

[8]   Even assuming that the Court had not given Hill a 2-level enhancement for role, as the Court has not given the defendant such an enhancement in its variance analysis, Hill would have still been facing a Level 33/VI, or 235-293 months range.  His 12-year sentence represents a 50% reduction from that range.

AO 72A
(Rev.8/82)

pronouncement that, because the court had sentenced a cooperator to a substantially lower sentence, the court was then also varying downward on a non-cooperator's sentence. The reason for this skepticism is that the district court controls the amount of departure that it awards for cooperation. If the amount of reduction is deemed too great by the court, it arguably should not award it. Otherwise, a sentencing court could give tremendous reductions for substantial assistance for the cooperator and then utilize that reduction as a basis for giving lenient sentences to defendants who had not cooperated, thereby gutting the rationale behind the substantial assistance provision.

The co-defendants in this case were sentenced before anyone had any notion that the Supreme Court would issue the *Booker* decision, however. Thus, clearly, this Court's level of reduction for the cooperating defendants was not influenced by any notion that such a reduction would carry some weight under a future § 3553 analysis. Instead, the Court relied heavily on the Government's recommendations on the appropriate level of reduction. Certainly, the Government was correct in its belief that these defendants had rendered substantial assistance that was crucial to the Government's ability to convict the defendant. Now that the Court can properly evaluate the disparity factor under a reasonableness analysis, it deems a 27 ½ year sentence for a Category I offender to be out of kilter with the substantially reduced sentences awarded to his co-defendants, who had far worse

30

criminal records.  The sixteen-year sentence that this Court finally imposed, however, is a sentence that recognizes a proper differential between the defendant, who did not cooperate or accept responsibility, and his co-defendants, who did.

A sixteen-year sentence imposed on a first offender, non-kingpin drug dealer who supervised no organized network of drug activity, is a sentence that adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  This sentence should serve to deter others from following in the path of the defendant and it should protect the public from the defendant's drug activities for an appropriate period of time.

In short, for all the reasons explained above, the Court imposed a 16-year sentence on the defendant, which sentence this Court deems to be a reasonable sentence pursuant to § 3553.


SO ORDERED this 25 day of August, 2006.


JULIE E. CARNES
UNITED STATES DISTRICT JUDGE


31